**23-1922**

# United States Court of Appeals for the Federal Circuit

BEARBOX LLC, AUSTIN STORMS,

*Plaintiffs-Appellants,*

– v. –

LANCIUM LLC, MICHAEL T. MCNAMARA, RAYMOND E. CLINE, JR.,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-00534-GBW-CJB*

## BRIEF OF APPELLEES

ADAM M. KAUFMANN
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
(312) 357-1313
adam.kaufmann@btlaw.com

MARK C. NELSON
BARNES & THORNBURG LLP
2121 North Pearl Street, Suite 700
Dallas, Texas 75201
(214) 258-4200
mark.nelson@btlaw.com

CHAD S.C. STOVER
BARNES & THORNBURG LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801
(302) 300-3434
chad.stover@btlaw.com

*Counsel for Defendants-Appellees*

OCTOBER 4, 2023

## EXEMPLARY CLAIMS FROM U.S. PATENT NO. 10,608,433

1.  A system comprising:

   [a] a set of computing systems, wherein the set of computing systems is configured to perform computational operations using power from a grid;

   [b] a control system configured to:

   [b1] monitor a set of conditions;

   [b2] receive power option data based, at least in part, on a *power option agreement*, wherein the power option data specify: (i) a set of *minimum power thresholds*, and (ii) a set of time intervals, wherein each *minimum power threshold* in the set of *minimum power thresholds* is associated with a time interval in the set of time intervals;

   [b3] responsive to receiving the power option data, determine a performance strategy for the set of computing systems based on a combination of at least a portion of the power option data and at least one condition in the set of conditions, wherein the performance strategy comprises a power consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the *minimum power threshold* associated with each time interval; and

   [b4] provide instructions to the set of computing systems to perform one or more computational operations based on the performance strategy.

16.  The system of claim 1, wherein the set of conditions monitored by the control system further comprise:

   [a] a price of power from the power grid; and

   [b] wherein the control system is configured to:

   [b1] determine the performance strategy for the set of computing systems based on a combination of at the portion of the power option data, the price of power from the power grid, the global mining hash rate and the price for the cryptocurrency,

[b2] wherein the performance strategy specifies for at least a subset of the computing systems to perform mining operations for the cryptocurrency when the price of power from the grid is equal to or less than a revenue obtained by performing the mining operations for the cryptocurrency.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**  2023-1922

**Short Case Caption**  Bearbox LLC v. Lancium LLC

**Filing Party/Entity**  Defendants-Appellees LANCIUM LLC, MICHAEL T. MCNAMARA, RAYMOND E. CLINE, JR.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/04/2023

Signature:  /s/ Mark C. Nelson

Name:  Mark C. Nelson

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Lancium LLC | | Lancium Inc. SBI Crytpo Investment Company Ltd. |
| Michael T. McNamara | | N/A |
| Raymond E. Cline, Jr. | | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| Barnes & Thornburg LLP | | |
|---|---|---|
| Mark C. Nelson of Barnes & Thornburg LLP | | |
| Adam M. Kaufmann of Barnes & Thornburg LLP | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives (continued)**

Chad S.C. Stover of Barnes &Thornburg LLP
Darrick J. Hooker of Barnes &Thornburg LLP
Benjamin Pendroff of Barnes &Thornburg LLP
Dana Sarros of Barnes &Thornburg LLP
David M. Lisch of Barnes &Thornburg LLP
William Burton of Barnes &Thornburg LLP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

STATEMENT OF RELATED CASES .................................................1

COUNTER-STATEMENT OF ISSUES ...............................................2

INTRODUCTION ................................................................................4

STATEMENT OF THE CASE...............................................................6

  I.   The Electrical Grid and Power Markets, the '433 Patent, and Plaintiffs' "System" .....................................................................................7

    A.  The electrical grid and power markets ........................................7

    B.  The '433 patent...........................................................................8

    C.  The "BearBox System" .............................................................10

  II.  The District Court Correctly Found that Lancium Independently Developed Its Technology. ...........................................................10

    A.  Lancium's technology development prior to meeting Storms ...................10

    B.  Storms' and McNamara's communications and the district court's findings regarding same ...................................................14

    C.  Lancium continues to independently develop its technology .....................17

  III. The Court Correctly Found Storms Did Not Conceive the '433 Patent's Technology and Did Not Communicate that Technology Prior to Defendants' Independent Conception. ........................................................................19

    A.  Neither Storms' source code nor his other materials demonstrate conception of the '433 patent. ...........................................19

    B.  The court found that Storms' communications with McNamara fail to support Plaintiffs' inventorship claims...........................22

   IV. Plaintiffs' conversion claim........................................................22

SUMMARY OF THE ARGUMENT ...................................................24

ARGUMENT ......................................................................................26

  I.   Standards of Review......................................................................26

  II.  The District Court Properly Found Plaintiffs' Conversion Claim Preempted and, Regardless, the Statute of limitation Bars the Claim, as does Louisiana Law......................................................................................27

    A.  Plaintiffs' conduct demonstrates that they consider the conversion claim to

be encompassed by the '433 patent. ...................................................................27

B.  Even if the conversion claim is not encompassed by the '433 patent the Court should still affirm. ..................................................................30

C.  This Court should affirm the district court's dismissal of Plaintiffs' conversion claim on two other, independent grounds. ......................................33

    1.  The statute of limitations bars Plaintiffs' conversion claim. ...................33

    2.  Plaintiffs' conversion claim fails because it was not deprived of any property.............................................................................................37

III. Plaintiffs Are Not Entitled to a Retrial on Their Inventorship Claims. .........41

IV. The District Court Did Not Abuse Its Discretion in Striking McClellan's Supplemental Expert Report. ...................................................................43

A.  Plaintiffs' timeliness and waiver argument lack merit and are moot..........43

B.  The district court correctly found that McClellan's "supplemental" report contained new opinions. ....................................................................44

C.  The district court properly considered and applied the *Pennypack* factors..............................................................................................48

V.  The District Court's Inventorship Judgments Should Be Affirmed...............51

A.  The district court correctly excluded Storms' hearsay testimony but did consider Storms' testimony. ................................................................52

    1.  The court correctly excluded Storm's hearsay testimony.......................52

    2.  The court properly analyzed McNamara's and Storms' testimony and the remaining evidence.........................................................................55

B.  The district court properly analyzed the evidence regarding inventorship.57

C.  The district court properly applied the rule of reason. ..............................59

VI. The Court Did Not Hold Plaintiffs' Evidence to a Heightened Standard. .....63

CONCLUSION ....................................................................................64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
  No. 17-1295, 2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ...............................32

*Afga Corp. v. Creo Products, Inc.*,
  451 F.3d 1366 (Fed. Cir. 2006) ...........................................................................43

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985)...............................................................................................27

*Andino v. Nicholson*,
  498 F.3d 1370 (Fed. Cir. 2007) ............................................................................26

*Aventis Pharma S.A. v. Hospira, Inc.*,
  637 F.3d 1341 (Fed. Cir. 2011) ............................................................................33

*BASF Agrochemical Prods. v. Unkel*,
  No. 05-1478, 2006 WL 3533133 (W.D. La. Dec. 7, 2006)...................................31

*Berrier v. Simplicity Mfg., Inc.*,
  563 F.3d 38 (3d Cir. 2009) ....................................................................................40

*Bihm v. Deca Systems, Inc.*,
  226 So.3d 466 (La. App. 1 Cir. 8/8/17) ......................................................... 33, 34

*Blue Gentian, LLC v. Tristar Products, Inc.*,
  70 F.4th 1351 (Fed. Cir. 2023) .............................................................. 26, 53, 60

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)...............................................................................................30

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
  No. 11-00556, 2014 WL 6674034 (M.D. La. Nov. 24, 2014) .............................31

*Brown v. Barbacid*,
  276 F.3d 1327 (Fed. Cir. 2002) ............................................................................60

*CamSoft Data Systems, Inc. v. Southern Electronics Supply, Inc.*,
  No. 2019-0731, 2019 WL 2865359 (La. Ct. App. July 2, 2019),
  *writ denied*, 282 So.3d 1071 (La. 2019) .................................................. 37, 38, 40

*Central Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
  482 F.3d 1347 (Fed. Cir. 2007) ...........................................................44

*Cheese Systems, Inc. v. Tetra Pak Cheese & Powder Systems, Inc.*,
  725 F.3d 1341 (Fed. Cir. 2013) ...........................................................50

*Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*,
  783 F.2d 480 (5th Cir. 1986) ........................................................ 40, 41

*Clark v. East Baton Rouge Parish Dep't of Public Works*,
  196 So.3d 142 (La. App. 1 Cir. 6/3/16) ...............................................37

*Coalition to Save our Children v. State Board of Education of
State of Delaware*,
  90 F.3d 752 (3d Cir. 1996) ...................................................................50

*Commercial Flooring & Mini Blinds, Inc. v. Edenfield*,
  138 So.3d 30 (La. App. 1 Cir. 2/14/14) ...............................................39

*Deere & Co. v. Int'l Harvester Co.*,
  710 F.2d 1551 (Fed. Cir. 1983) ...........................................................54

*Dorsey v. Money Mack Music, Inc.*,
  304 F. Supp. 2d 858 (E.D. La. 2003) ...................................................31

*Dual Drilling Co. v. Mills Equip. Invs., Inc.*,
  721 So.2d 853 (La. 1998) ......................................................... 31, 38, 39

*Edward Levy Metals, Inc. v. New Orleans Public Belt R.R.*,
  148 So.2d 580 (La. 1963) .....................................................................39

*Endo Pharm. Inc. v. Teva Pharm. USA, Inc.*,
  919 F.3d 1347 (Fed. Cir. 2019) ...........................................................38

*Fleming v. Escort Inc.*,
  774 F.3d 1371 (Fed. Cir. 2014) ...........................................................60

*General Electric Co. v. Wilkins*,
  750 F.3d 1324 (Fed. Cir. 2014) ........................................ 48, 56, 59, 62

*GPNE Corp. v. Apple, Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016) ...........................................................44

*Guillot v. Doughty*,
  142 So.3d 1034 (La. App. 1 Cir. 3/21/14) ...................................... 33, 34

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
  946 F.3d 1322 (Fed. Cir. 2020) .............................................................. 26, 27, 64

*Importsales, Inc. v. Lindeman*,
  92 So.2d 574 (La. 1957) ...................................................................................39

*In re Rosuvastatin Calcium Patent Litig.*,
  703 F.3d 511 (Fed. Cir. 2012) ........................................................................59

*INVISTA N. Am. S.a.r.l. v. M&G USA Corp.*,
  No. 11-1007, 2013 WL 3216109 (D. Del. June 25, 2013) ...................................49

*Lindy Bros. Builders, Inc. of Philadelphia v.*
  *Am. Radiator & Standard Sanitary Corp.*,
  540 F.2d 102 (3d Cir. 1976) .............................................................................48

*Linear Technology Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004) ........................................................................62

*Litton Indus. Prod., Inc. v. Solid State Sys., Corp.*,
  755 F.2d 158 (Fed. Cir. 1985) .........................................................................40

*Mabile v. BP, P.L.C.*,
  No. 11-1783, 2016 WL 5231839 (E.D. La. Sept. 22, 2016) ..............................40

*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) .........................................................................60

*Medichem, S.A. v. Rolabo, S.L.*,
  437 F.3d 1157 (Fed. Cir. 2006) ........................................................................51

*Medtronic, Inc. v. Daigle Corp.*,
  789 F.2d 903 (Fed. Cir. 1986) ........................................................ 48, 56, 59, 62

*MicroStrategy Inc. v. Business Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005) ........................................................................40

*Monon Corp. v. Stoughton Trailers, Inc.*,
  239 F.3d 1253 (Fed. Cir. 2001) ........................................................................59

*Naghi v. Brener*,
  17 So.3d 919 (La. 2009) ...................................................................................35

*Nat'l Presto Indus., Inc. v. West Bend Co.*,
  76 F.3d 1185 (Fed. Cir. 1996) .................................................................... 52, 54

*Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
   923 F.3d 1368 (Fed. Cir. 2019) ...........................................................59

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ...........................................................55

*Polaroid Corp. v. Eastman Kodak Co.*,
   789 F.2d 1556 (Fed. Cir. 1986) ..........................................................61

*Praxair, Inc. v. ATMI, Inc.*,
   231 F.R.D. 457 (D. Del. 2005), *reversed on other grounds by*
   543 F.3d 1306 (Fed. Cir. 2008) ..........................................................49

*Price v. Symsek*,
   988 F.2d 1187 (Fed. Cir. 1993) .............................................. 51, 57, 60

*Quealy v. Paine, Webber, Jackson & Curtis, Inc.*,
   475 So.2d 756 (La. 1985) ....................................................... 31, 37, 40

*Rapides Parish School Board v. Zurich American Insurance Co.*,
   279 So.3d 981 (La. App. 3 Cir. 8/21/19) ................................. 35, 36, 37

*Reckitt Benckiser Inc. v. Tris Pharma, Inc.*,
   No. 09-3125, 2011 WL 6722707 (D.N.J. Dec. 21, 2011) ....................49

*REG Synthetic Fuels, LLC v. Neste Oil Oyj*,
   841 F.3d 954 (Fed. Cir. 2016) ............................................................53

*Safe Air Technology, LLC v. Christie*,
   No. 2017-0320, 2017 WL 4082243 (La. App. 1 Cir. 9/15/17)............35

*Shum v. Intel Corp.*,
   499 F.3d 1272 (Fed. Cir. 2007) .............................................. 41, 42, 43

*Snavely v. Ace Pain Management, LLC*,
   No. 15-903, 2016 WL 454952 (La. App. 3 Cir. 2/3/16)......................35

*Sortiumusa LLC v. Hunger*,
   No. 11-1656, 2013 WL 11730655 (N.D. Tex. Mar. 31, 2013) ............32

*St. Clair Intellectual Prop. Consultants, Inc. v.*
   *Matshushita Elec. Indus. Co., Ltd.*,
   No. 04-1436, 2012 WL 1015993 (D. Del. Mar. 26, 2012)..................44

*Suffolk Technologies, LLC v. AOL Inc.*,
  752 F.3d 1358 (Fed. Cir. 2014) .................................................49

*Symantec Corp. v. Computer Associates Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008) ........................................ 52, 60

*Transweb, LLC v. 3M Innovative Properties Co.*,
  812 F.3d 1295 (Fed. Cir. 2016) ....................................... 51-52

*Tri-state Bancshares, Inc. v. Scott*,
  No. 15-2053, 2016 WL 4098604 (W.D. La. July 28, 2016) ......................... 40-41

*Ultra-Precision Mfg., Ltd v. Ford Motor Co.*,
  411 F.3d 1369 (Fed. Cir. 2005) .................................................30

*Ultratec, Inc. v. CaptionCall, LLC*,
  287 F.3d 1274 (Fed. Cir. 2017) .................................................54

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
  270 F. Supp. 2d 519 (D. Del. 2003).............................................44

*Univ. of Colorado Found., Inc. v. American Cyanamid Co.*,
  196 F.3d 1366 (Fed. Cir. 1999) .................................................29

*Univ. of Colorado Found., Inc. v. American Cyanamid Co.*,
  342 F.3d 1298 (Fed. Cir. 2003) .................................................29

*Wawrzynski v. H.J. Heinz Co.*,
  782 F.3d 1374 (Fed. Cir. 2013) .................................................29

*Williams v. Drake*,
  146 F.3d 44 (1st Cir. 1998).....................................................54

*Yost v. A.O. Smith Corp.*,
  562 F.2d 592 (8th Cir. 1977) ..................................................54

**Other Authorities:**

Fed. R. Civ. P. 12(b)(6)........................................................38

Fed. R. Civ. P. 61 ...............................................................55

Fed. R. Evid. 103(a)(1) .........................................................55

Fed. R. Evid. 103(a)(2) .........................................................54

## <u>STATEMENT OF RELATED CASES</u>

Counsel for Appellees Lancium LLC, Michael T. McNamara, and Raymond E. Cline, Jr. (collectively, "Lancium" or "Appellees") are aware of the following cases that may directly affect or be directly affected by this Court's decision in the pending appeal:

- *Lancium LLC v. U.S. Data Mining Group, Inc., et al.*, Case No. 6:23-cv-00344-KC pending in the United States District Court for the Western District of Texas, Waco Division (in which infringement of U.S. Patent No. 10,608,433 is asserted); and

- *OBM, Inc., et al. v. Lancium LLC*, IPR2023-01407 pending before the United States Patent and Trademark Office (in which invalidity of U.S. Patent No. 10,608,433 is asserted).

No other appeal from this proceeding has been previously before this or any other appellate court.

## **COUNTER-STATEMENT OF ISSUES**

1.    Should this Court set aside the district court's finding that federal patent law preempted Plaintiffs' "patent-like" conversion claim and order a new trial on the issue of inventorship, where (a) Plaintiffs' admissions establish that its conversion claim sought "patent-like" protection, (b) both the statute of limitations and Louisiana state law independently bar Plaintiffs' conversion claim as a matter of law, and (c) under Plaintiffs' no-preemption theory (*i.e.*, that its conversion claim does not relate to its inventorship claims), there is no common issue justifying retrial?

2.    Should this Court find the district court abused its discretion in striking Plaintiffs' expert Dr. McClellan's supplemental expert report, where (a) the report was served without leave three weeks before trial, (b) the report offered new opinions based on the district court's claim constructions (which Plaintiffs do not challenge), (c) the constructions the court adopted were identified six months earlier in Defendants' expert Dr. Ehsani's report, and (d) McClellan acknowledged, but did not address, the parties' claim construction dispute in his reply report?

3.    Should this Court reassess the district court's evidentiary and credibility determinations and reweigh the evidence to find the district court abused its discretion in finding that Austin Storms was not the sole or a joint inventor of the '433 patent, where the district court (a) correctly excluded portions of Storms'

2

testimony on hearsay grounds, (b) correctly made credibility determinations against Plaintiffs and their experts based on numerous inconsistencies in their testimony, and (c) thoroughly and correctly analyzed the entirety of the evidence, and correctly applied the law?

## INTRODUCTION

This appeal is a classic case of an appellant asking this Court to assume the role of fact-finder to reassess the district court's credibility and evidentiary determinations and reweigh the evidence to reach different factual conclusions. For example, contrary to Plaintiffs' argument, the court did not abuse its discretion by striking the "supplemental" report served by Plaintiffs' expert Dr. Stanley McClellan ("McClellan") without leave three weeks before trial because the report offered opinions that not only were new, but that contradicted his earlier opinions. Appx92-94. Nor did the court abuse its discretion by finding that Plaintiffs' excuse for the late disclosure—the court's claim constructions that adopted Defendants' proposals—lacked merit when Plaintiffs knew of and acknowledged the dispute months earlier, yet failed to address the issue. Appx94-96.

It was also not an abuse of discretion for the court to exclude portions of would-be inventor Plaintiff Austin Storms' ("Storms") testimony about what he allegedly told Defendant Michael McNamara ("McNamara") at a cocktail reception and group dinner some three years earlier. The court properly concluded that because Plaintiffs would rely on the truth of such out-of-court statements to prove Storms' alleged prior conception such testimony was "classic hearsay." Appx8025-8026 at 79:17-82:9.

The Court should also reject Plaintiffs' remaining inventorship arguments.

Plaintiffs' arguments regarding the district court's evidentiary analysis (*e.g.*, that the court erred by considering Plaintiffs' evidence piecemeal and/or by considering the claim elements individually) fail because they are not true. A review of the entire record demonstrates the district court conducted the proper analysis. *See* Appx2-51 (containing 145 paragraphs of factual findings). Similarly, the record indicates the court correctly applied the "rule of reason" and did not hold Plaintiffs' so-called corroborating evidence to a heightened standard. Appx2-59. Plaintiffs no doubt hoped for a different result, but where there are two views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

Plaintiffs' collateral attack on the inventorship trial fares no better. Plaintiffs argue the district court erred in granting summary judgment that federal patent law preempted its conversion claim and, using that argument as a springboard, argue that common issues between Plaintiffs' conversion claim and inventorship claims require a jury trial on both. But Plaintiffs cannot, on appeal, walk back their expert's admissions (*e.g.*, that Storms' use of the allegedly converted property (Storms' arbitrage method) may "end up infringing the '433 patent (Appx86-87, Appx6168 at 231:11-232:1)), or their own arguments equating the "performance strategy" of claim 16 with the arbitrage and sell-back concepts purportedly communicated in the "Data File" attachment to Storms' email that forms the basis of their conversion claim. *See*, *e.g.*, Appx8090 at 367:13-369:14. Moreover, even if not preempted, the

statute of limitations and Louisiana law bar Plaintiffs' conversion claim. Finally, Plaintiffs' most recent no-preemption rationale (*i.e.*, the "ideas and materials" supporting conversion are "not found" in the patent (Br. at 36)) destroys the common issue requirement that undergirds Plaintiffs' request for joint jury trial on conversion and inventorship.

In sum, the district court's decisions are legally correct, and based on substantial evidence, which it carefully and correctly weighed. This Court should affirm.

## STATEMENT OF THE CASE

This entire dispute stems from a May 3, 2019 chance meeting between Storms and McNamara at a happy hour after the Fidelity FCAT conference on cryptocurrency mining ("the FCAT Summit") and a dinner immediately thereafter attended by Storms, McNamara, and six other friendly competitors. These events led to Storms and McNamara exchanging a few text messages and a single May 9, 2019 email with a handful of attachments that Storms sent to McNamara. It is undisputed that these are the only communications between the parties. Appx21-24 at ¶¶65-74. As the district court found, McNamara looked at the attachments to the email for *no more than three minutes,* considered the price of Storms' "BearBox" container for Bitcoin miners to be too high, and forwarded the email to Defendant Raymond E. Cline, Jr. ("Cline") stating the same. Cline thought Storms' container did not

favorably compare to other third-party containers because Storms' container was expensive, small, and lacked industry safety features. Appx27 at ¶¶84-85. McNamara and Cline never looked at the email again until this lawsuit. Appx8129 at 491:6-25, Appx8149-8150 at 567:24-569:1.

**I.    The Electrical Grid and Power Markets, the '433 Patent, and Plaintiffs' "System"**

Prior to addressing Plaintiffs' specific arguments, it is important to understand the background of the electrical grid and power markets, the specifics of the '433 patent, and Plaintiffs' "BearBox System."[1]

**A.    The electrical grid and power markets**

Plaintiffs' expert Frank McCamant ("McCamant") provided an overview of the electrical grid and the power markets as they relate the Electric Reliability Council of Texas ("ERCOT") at trial. *See generally* Appx8048-8058. He described two different ERCOT markets: the day-ahead energy market ("DAM") and an ancillary services market. Appx8-9. The energy market is for buyers and sellers of energy. It is financially binding such that if a load (*i.e.*, a user of electricity (Appx8050 at 181:1-6)) buys energy in the DAM it must pay for that energy, *but it does not have to use the energy*. Appx8, Appx8056 at 202:8-11, 202:18-20, 203:4-

---

[1] The district court broadly refers to the "BearBox System" as Storms' development (Appx10), including Storms' email to McNamara and its attachments (Appx13323-13339), as well as BearBox's source code and other materials presented at trial.

24. Instead, the load could sell the power in the real-time energy market ("RTM"), which is termed "sell-back." Appx8, Appx8056 at 203:15-20, 203:25-204:13.

The ancillary services market is different. In the ancillary services market, ERCOT has the ability to decrease the amount of energy used by participating loads. Appx9, Appx8057 at 207:4-7. The load (through an intermediary) submits an offer and is granted an "award," which specifies the minimum amounts of power the load *must use* during specific time intervals (*i.e.*, it cannot "sell-back," even if it is unprofitable to use the energy). Appx9, Appx8052-8053 at 189:24-190:13, 192:6-11. If the demand for power on the grid is high, ERCOT can instruct the participating load to decrease (*i.e.*, "curtail") its power usage during a time interval up to the amount of the award for that interval thus freeing up additional energy for the grid. Appx8057 at 206:5-207:20. The load receives a "capacity payment" for providing ERCOT the option to curtail the load's power usage up to the amount of the award. Appx9, Appx8057-8058 at 207:8-11, 209:23-210:9, 212:5-16, Appx8053 at 190:14-24.

## B.    The '433 patent

The '433 patent relates to the ancillary services market. The claims recite systems and methods for adjusting power consumption by giving a power entity (*e.g.*, a grid operator like ERCOT) the ability to set the minimum amount of power (the "minimum power threshold") a load (*i.e.*, a set of computing systems) must use.

8

Appx119-120 at 1:26-4:13, Appx2620-2622. A control system receives "power
option data" specifying, *inter alia*, "a set of minimum power thresholds" and,
"responsive" to receiving this data, determines "a performance strategy" based on at
least a portion of this data and at least one monitored condition to set a "power
consumption target" equal to or greater than the "minimum power threshold."
Appx148 at 59:1-25. The system then provides instructions to the set of computing
systems based on that strategy. Appx148 at 1:26-28. Under such a system, a load
that receives an ancillary services award *cannot sell* the amount of power awarded
back to the electrical grid, but instead *must use* the awarded power regardless of
profitability. Appx8057 at 208:9-209:22, Appx8130 at 494:17-496:14.

The district court's constructions of "power option agreement" and "minimum
power threshold," which Plaintiffs do not challenge, confirm these requirements.
Appx6021.

| Claim Term | District Court's Construction |
|---|---|
| "power option agreement" | "an agreement between a power entity associated with the delivery of power to a load and the load, wherein the load provides the power entity with the option to reduce the amount of power delivered to the load up to an agreed amount of power during an agreed upon time interval such that the load must use at least the amount of power subject to the option during the time interval unless the power entity exercises the option" |
| "minimum power threshold" | "a minimum amount of power a load must use during an associated time interval" |

## C.    The "BearBox System"

Plaintiffs' technology is different. It is directed at the energy market where a load may pre-purchase power in the day-ahead market and then, based on maximizing profitability, either (i) use that power to mine cryptocurrency (*e.g.*, Bitcoin), or (ii) not use the power and instead sell the power in the real-time market ("sell-back"). Appx8040 at 140:13-16, App8042-8043 at 149:10-150:21, Appx8056 at 202:8-204:13, Appx8107 at 404:10-14. As Storms admitted, nowhere in the materials he emailed McNamara (Appx13323-13339) is there an indication that Plaintiffs' technology must utilize a specified amount of power for a specified time-period regardless of the profitability of doing so. Appx8041-8042 at 145:25-146:5. Plaintiffs' expert McClellan agreed, testifying it "doesn't make any sense" to require the BearBox System to use a required amount of power regardless of profitability— "this [referring to Plaintiffs' materials] doesn't teach that." Appx8108 at 406:3-23.

## II.    The District Court Correctly Found that Lancium Independently Developed Its Technology.

During trial, Defendants credibly demonstrated that McNamara and Cline independently conceived and developed the subject matter of the '433 patent's claims and other technology, as summarized below.

### A.    Lancium's technology development prior to meeting Storms

McNamara and Cline co-founded Lancium in 2017 to encourage the production of renewable energy by co-locating flexible datacenters (*e.g.*, Bitcoin

miners) next to windfarms. Lancium's initial vision was to "ramp down" its datacenters when power prices were high, allowing the windfarm to sell the power to the grid, and "ramp up" its datacenters when power prices were low to provide the windfarm a load for its low-priced power. Appx16, Appx8116 at 437:11-439:19, Appx11767-11796, Appx8143 at 541:21-542:15, Appx11606, Appx11784, Appx8141 at 533:22-534:16, Appx11766, Appx8142-8143 at 539:9-540:21, 541:5-10, Appx11601.

Lancium patented aspects of this early energy-market technology long before meeting Storms. In early 2018, McNamara and Cline filed a patent application published as WO 2019/139632A1 titled "Method and System for Dynamic Power Delivery to a Flexible Datacenter Using Unutilized Energy Source" (the "'632 application"). Appx16-17, Appx9711. The '632 application taught connecting the flexible data center to a wind farm, a local control station, and the grid operator, and using a datacenter control system to "dynamically modulate power delivery to one or more computing systems" (*e.g.*, Bitcoin miners performing "computational operations, such as blockchain hashing operations") based on monitored conditions. Appx16-17, Appx9717-9730 at ¶¶22, 30, 33, 38, 53, 54, Appx8117 at 441:13-443:8, Appx9745, Appx9749, Appx8117-8118 at 444:16-445:19. The monitored conditions included "operational directives" from the windfarm and potentially from the grid operator indicating how much power the load could consume (Appx9735 at

11

¶68, Appx9751, Appx8118 at 445:2-446:10, 448:7-23), as well as "economic considerations" such as the real-time price of power, the price of Bitcoin, and other information enabling the load to determine whether it was profitable to mine. Appx17 at ¶56, Appx9714-9737 at ¶¶4, 9, 42, 44, 68-72, Appx8118 at 446:11-448:6, Appx8143-8144 at 542:16-544:5, Appx12350.[2]

Lancium built a working datacenter at its Thomas Road R&D facility in Houston, Texas ("Thomas Road") in 2018. Appx17-18, Appx8118-8119 at 448:24-450-21, Appx11817, Appx11828. Thomas Road initially used modified off-the-shelf software to, *inter alia*, monitor power price, Bitcoin price, and the network/global hashrate (a parameter associated with Bitcoin mining (Appx8115 at 434:16-24)) to calculate a "Breakeven Price" (*i.e.*, the price at which it was profitable to mine (Appx8161 at 615:7-18)) for different types of miners and determine a performance strategy to decide whether to turn different miners on or off. Appx18, Appx8123-8126 at 467:24-468:4, 469:13-470:11, 470:12-471:1, 472:6-473:4, 477:18-20, 478:12-479:2, Appx11567-11568, Appx11734. Lancium demonstrated its live system with 120 Bitcoin miners in September 2018. Appx18, Appx8121-8122 at 459:16-461:14 (discussing Appx11411-11412), Appx8122-8123 at 464:14-465:4 (discussing Appx11394-11395), Appx8123 at 465:5-468:4 (discussing Appx11408-11410). Lancium also contemplated monitoring Locational Marginal Price

---

[2] Lancium obtained other patents as well. Appx1101-1102 at ¶24.

("LMP"), ERCOT parameters, and weather conditions (Appx8124 at 471:2-472:5, Appx11567-11568), and controlling its systems remotely from its Network Operating Center or via a mobile computing device. Appx18, Appx8122 at 463:24-464:13, Appx11395, Appx9720 at ¶¶29-30, Appx11411-11412. By May 1, 2019, two days before McNamara first met Storms, Lancium's software (then known as the Lancium Brain, but eventually becoming Lancium Smart Response) was configured to monitor signals from a wind farm and ERCOT as well as Bitcoin price, real-time power price, hashrate, block height, and the miners' actual power usage. Appx19-20, Appx8127 at 482:14-484:17, Appx11656-11658, Appx8127-8128 at 484:18-487:7, Appx11657-11658.

Throughout 2018 and 2019, Lancium worked with various companies to design and manufacture portable mining containers ("boxes") that Lancium would then contract to buy, deploy, and control with Lancium software. Appx20, Appx8120-8121 at 454:20-456:24, 457:7-17, Appx11759, Appx13568-13569. For example, shortly before meeting Storms, Lancium was considering forty-foot containers from manufacturer JV Driver/Ready Engineering that could use two megawatts of power, hold ~1,428 miners, and met industry safety standards at a cost of $230,000. Appx8125 at 475:5-24, Appx13030, Appx8128-8129 at 488:21-491:5, Appx8146 at 552:23-553:24. Also, prior to meeting Storms, Lancium was considering whether it could apply its technology to grid applications because on

13

May 2, 2019 McNamara met with cryptocurrency developer Jamie McAvity ("McAvity") and learned that participating in ERCOT's Emergency Response Service ("ERS") program, which is a type of demand response program, could effectively discount the price of power from the grid. Appx20, Appx8147 at 556:22-558:13, 559:3-15, Appx12431-12432.

## B. Storms' and McNamara's communications and the district court's findings regarding same

On May 3, 2019, Storms and McNamara met for the first time at a cocktail reception after the FCAT Summit. Appx21, Appx8025 at 79:3-5, Appx8034 at 116:13-17. Storms attended that Summit to meet potential customers for his cryptocurrency mining container and "to poke around to figure out what others were doing.[3] Appx20-21, Appx8024-8025 at 77:18-78:18, Appx8033 at 110:21-111:7, Appx9137, Appx8035 at 118:5-11. McNamara also attended the FCAT Summit where he continued his discussions with McAvity about ERS demand response programs within ERCOT. Appx8147-8148 at 559:19-560:2.

Following the reception, Storms, McNamara, and approximately six others went to dinner. Appx21, Appx8026 at 82:22-24, Appx8033-8034 at 113:10-114:12, Appx8059 at 216:12-14. The dinner had a causal atmosphere of friendly competitors

---

[3] BearBox only sold one of its mining containers, did not turn a profit, and currently manufactures no products, has no assets, and has only one employee—Storms. Appx3, Appx8033 at 110:1-7, Appx8038 at 132:7-11.

talking shop. Appx8034 at 114:13-20, 115:16-17, Appx8148 at 561:5-23. At dinner, McNamara discussed Lancium's need for boxes and Storms discussed his "BearBox" container (Appx21, Appx8026 at 84:12-23, Appx8148 at 563:3-12), but did not discuss ERS, demand response programs, or ancillary services. Appx21, Appx8148 at 562:25-563:2. No documents or source code were shown at the dinner (Appx21, Appx8034 at 15:18-116:4) and, although Storms remembered the names of the other dinner attendees (Appx8033-8034 at 113:10-114:10, Appx8148 at 560:3-14) Plaintiffs did not depose any of them or call them as trial witnesses. Appx4.

Storms and McNamara exchanged telephone numbers, which resulted in the two exchanging a handful of text messages between May 4 and May 7, 2019, none of which communicated any information relating to the subject matter of the '433 patent or other technical information. Appx22, Appx12427-12428.

On May 9, 2019, Storms sent McNamara an email. Appx23-24. The email had several attachments: (1) a one-page BearBox Production Specification Sheet (the "Spec Sheet," Appx11371); (2) an annotated diagram of BearBox's Automatic Miner Management System (the "Diagram," Appx11372); (3) specification sheets on fans and other components (Appx11373-11376); and (4) a data file modeling a simulation of the BearBox System (the "Data File," Appx11377-11393). Appx24. It is undisputed that Storms and McNamara never communicated again after this

email. Appx24, Appx8034 at 115:23-116:4, Appx8111 418:21-419:3, Appx8149 at 565:3-6. Plaintiffs' claims thus hinge on the Spec Sheet, Diagram, and Data File.

The district court found that Storms admitted the Spec Sheet and Diagram did not indicate whether the BearBox System (i) required the system use a certain amount of power, (ii) must use at least a specified amount of power for a specified time-period, or (iii) measured the actual amount of power the system used. Appx25, Appx11371, Appx8039 at 135:22-136:1, Appx8041-8042 at 145:14-146:5, Appx8179 at 684:18-23. Storms made similar admissions with respect to the Data File (Appx26-27, Appx8041-8042 at 145:14-146:5), and also admitted the Data File represented a simulation of whether to mine Bitcoin or sell power back to the grid, where the decision to mine or sell-back was made by the load (*i.e.*, not a power entity). Appx26, Appx8040 at 140:13-16, Appx8042-8043 at 149:10-150:21. Storms further admitted he did not consider the Spec Sheet or his Diagram to be confidential[4] and that he sent a spreadsheet nearly identical to the one he sent to McNamara (as well as source code) to a third party without a confidentiality agreement or a representation that it would be kept confidential. Appx27, Appx13408-13409, Appx13411-13447, Appx8043 at 151:10-17, 151:23-152:2, Appx2939 at 72:18-23, Appx2945 at 188:1-189:2, Appx8033 at 112:2-4.

---

[4] Storms posted the Diagram on Twitter. Appx2950 at 247:10-248:6, Appx8039 at 136:2-11, Appx13353.

16

**C.    Lancium continues to independently develop its technology**

The district court found McNamara credibly testified that he spent no more than three minutes reviewing the attachments to Storms' email (Appx27, Appx8149 at 567:9-23), and that he considered the price of the BearBox mining container to be too high compared to other container manufacturers Lancium solicited. Appx27, Appx8149 at 565:11-22. McNamara also forwarded Storms' email to Cline, writing that BearBox's container was "very expensive." Appx27, Appx12946. The court credited Cline's testimony that, upon receiving the forwarded email, Cline reviewed the Spec Sheet and believed the BearBox container was expensive, small, and lacked important industry safety features when compared to the box JV Driver was designing and manufacturing for Lancium. Appx27, Appx8128-8129 at 488:17-491:5. Neither looked at the email again before this lawsuit. Appx8129 at 491:6-25, Appx8149-8150 at 567:24-569:1.

Lancium learned of sell-back in August 2019 when an email exchange between McNamara and Lancium's electricity provider, Calpine, led to Lancium entering into a fixed price power addendum with Calpine on August 14, 2019 to lock in then-favorable low-price power rates. Appx28, Appx8151 at 573:21-575:25, Appx12472-12473, Appx9361, Appx12474-12478. The addendum contained the same standard, non-negotiated "sell-back" provision (Section 4.2.2) (Appx28, Appx8152 at 576:1-17, Appx12466-12471) that was previously included in

17

Lancium's 2018 power agreement with Calpine (Appx28-29, Appx8152 at 576:18-577:6, Appx9362), but Lancium had not appreciated it then because, until entering into the 2019 fixed-price addendum, Lancium was not pre-purchasing power and, thus, could not sell it back. Appx29, Appx8146 at 566:20-25, Appx8152 at 577:7-15, 578:2-5, 578:23-579:5. Two days later, on August 16, 2019, McNamara emailed Cline stating: "This is cool. We now have two revenue sources: Bitcoin mining and selling power back to the grid." Appx29, Appx12348. The court found McNamara's testimony that Lancium learned of "sell-back" from Calpine, not Storms, was "credible" and relied on it. Appx29.

Lancium also continued to develop its technology, which ultimately led to Lancium qualifying as an ancillary service "load resource" within ERCOT. Appx28, Appx8150-8151 at 569:3-10, 570:5-573:18, Appx12431-12465, Appx12358, Appx11797, Appx11807-11809, Appx12395-12426, Appx12329, Appx12337. On August 26, 2019, Lancium received its first "award" under ERCOT's Load Resource Ancillary Services Program. Appx29, Appx13570-13571, Appx8129-8130 at 492:15-494:5. The court found Cline's testimony that, upon receiving this "award," he realized that "the award is essentially an obligation on [Lancium's] part, that we consume that amount of power that ERCOT COULD curtail" to be credible. Appx29, Appx12344, Appx8130 at 494:17-496:14. That realization led Cline to understand that Lancium was obligated to consume the awarded power, which led

18

to Lancium developing strategies to ensure that its system used at least the awarded amount of power, *i.e.*, the "minimum power threshold." Appx29, Appx12344, Appx11632-11638, Appx8130-8131 at 496:8-25, 497:1-499:5, Appx12352-12356. These strategies were the final pieces to Cline and McNamara's conception of the '433 patent. On October 28, 2019, Lancium filed provisional application no. 62/927,119 disclosing and claiming the specifics of these concepts. Appx11232-11363. Lancium then filed application no. 16/702,931, which claimed priority from the earlier provisional and ultimately issued as the '433 patent. Appx30, Appx101, Appx6216 at ¶6.

## III.  The Court Correctly Found Storms Did Not Conceive the '433 Patent's Technology and Did Not Communicate that Technology Prior to Defendants' Independent Conception.

### A.  Neither Storms' source code nor his other materials demonstrate conception of the '433 patent.

Plaintiffs assert that Storms' source code supports his alleged conception of the '433 patent's invention. The district court found otherwise. To begin, however, many of the ideas contained in this source code came from two other individuals Storms interacted with: Benjamin Hakes ("Hakes") and Denis Labij ("Labij"). *See* Appx10-13 at ¶¶30-40, Appx13450, Appx8116 at 439:17-440:1, Appx8943-8944. Hakes prompted Storms to write code to "determine whether or not to mine based on the price of power" (Appx10-11, Appx8943, Appx8020 at 59:7-18, 60:23-61:4, Appx8165 at 628:12-629:22), an idea that Storms said was "one of the coolest things

I've ever put together FYI." Appx8950, Appx8166 at 633:20-634:16.

Labij explained to Storms how to analyze profitability for Bitcoin mining, including (i) the need to calculate a breakeven price, (ii) how to calculate the potential revenue earned by selling back power in the real-time market, and (iii) how to compare the profitability of mining Bitcoin to selling-back power in the real-time market. Appx12-13, Appx13566-13567, Appx8160-8162 at 610:8-619:10. Denis Labij's explanation "tremendously" helped Storms' understanding of "how these markets work" (Appx12-13, Appx9454-9455), and Storms named his source code, which Plaintiffs maintains is evidence of his conception, "denis_logic." Appx14, Appx8045 at 160:20-161:25, Appx9061, Appx9109. Plaintiffs also rely on these Labij-derived arbitrage/sell-back concepts for their conversion argument, as discussed below.

Regardless of its origin, Storms never provided his source code, or whiteboard descriptions of it, to Defendants. Appx13, Appx8034 at 115:18-22, Appx8111 at 418:21-419:3, Appx8149 at 565:3-6. Nevertheless, the parties each offered expert testimony regarding the code's functionality and operation because Storms claimed the code corroborated his conception of each claim of the '433 patent. The district court found Defendants' expert Nikolaus Baer ("Baer") to be "more credible" than Plaintiffs' expert McClellan. Appx13.

Baer testified that Storms' code fell into three categories: (1) a user interface

that would provide some manual control of a power distribution unit ("PDU"); (2) retrieving publicly available Bitcoin and power pricing data; and (3) simulations comprising profitability of mining Bitcoin versus selling power. Appx13, Appx8168 at 643:5-15. The district court concluded that Storms' source code *did not* support the conception of the claims of the '433 patent for multiple reasons. As to the first category, it only allowed a user to manually control PDU relays attached to Bitcoin miners and was in "no way" associated with the other two categories of code (Appx13, Appx8168-8169 at 643:16-645:9), which Storms conceded. Appx13-14, Appx8044-8045 at 157:18-158:7. The second category just received publicly available information. Appx14, Appx8169 at 645:10-646:24. Finally, although the third category (the "denis_logic"-based code) did relate to Storms' Diagram and Data File, the court found that "Baer credibly testified" that it did not receive time interval information, much less time intervals associated with an amount of power. Appx34-35 (citing Appx15, Appx8171 at 654:13-25, 655:1-11, Appx8174 at 666:10-19). The only concept of power usage in Storms' code is the value "kW_load." Appx15, Appx8173 at 660:3-662:16. That value, however, is a single, hard-coded value in Storms' code (Appx15, Appx8042 at 146:23-147:6, Appx8173 at 660:3-662:16, Appx8174 at 665:12-666:9) and is not a "received" "minimum power threshold" as required by the claims, but rather is an estimate of the power the BearBox system uses. Appx15, Appx8174 at 665:12-666:9, Appx8077 at

282:19-283:9, Appx8080 at 294:22-295:6, Appx8081 at 297:14-22, Appx9110, Appx8111 at 420:12-18, Appx8112 at 424:5-11.

### B.    The court found that Storms' communications with McNamara fail to support Plaintiffs' inventorship claims.

The district court found that Plaintiffs failed to prove by clear and convincing evidence that the Spec Sheet, Diagram, and Data File (collectively, the "Email") communicated the elements of the independent claims (Appx32-39, 54, 58) and dependent claims (Appx39-51 at ¶¶117, 119-120, 125, 130, 138-140, 144, Appx58) and/or failed to prove by clear and convincing evidence that Storms' Email significantly contributed to the claims because Defendants had "independently conceived of, and reduced to practice" the subject matter prior to receiving Storms' Email. Appx30-47 at ¶¶95, 118, 135, 137, Appx54, Appx58-59. As discussed below, both testimony and contemporaneous documents support these factual findings.

### IV.    Plaintiffs' conversion claim

To understand Plaintiffs' conversion claim, it is important to understand its evolution. The Original and First Amended Complaints define "BearBox Technology" as:

> an energy-efficient cryptocurrency mining system and related methods that reduce the inefficiency and environmental impact of energy-expensive mining operations by better utilizing available resources to increase stability of the energy grid, minimize a mining operation's impact on peak-demand, and also alleviate electricity undersupply

and/or oversupply conditions … [which] can be used to mine cryptocurrency such as Bitcoin.

Appx192-193, Appx82, Appx623-624. Plaintiffs' initial conversion claim alleged "Defendants assumed dominion and control over the BearBox Technology by claiming it as their own in the '433 patent … [and] have wrongfully obtained the purported ability to exclude Plaintiffs and others from using the BearBox Technology." Appx203-204, Appx634-635. Defendants successfully dismissed this conversion claim as preempted by federal patent law. Appx1615-1616, Appx1630.

Plaintiffs re-pleaded conversion in their Second Amended Complaint (SAC), but did not redefine "BearBox Technology." *Compare* Appx623-624 at ¶2, *with* Appx1631-1632 at ¶2. Instead, they specifically identified the allegedly converted technology as including "system designs, documents, data, and know-how." Appx1649. Plaintiffs also incorporated their inventorship allegations into the conversion claim, and alleged that Defendants are liable for conversion because Defendants "intentionally and willfully assumed dominion and control over confidential BearBox technology… [and] permanently interfered with Plaintiffs' valuable property rights." Appx1649-1650 at ¶¶84, 88.

Later, in response to Defendants' motion for summary judgment, Plaintiffs averred that this conversion claim "is based on theft of material that is *not* included in the '433 Patent, and therefore does *not* seek 'patent-like' relief." Appx4282

23

(emphasis original). But the court disagreed, finding Plaintiffs' attempt to differentiate their conversion claim as relying on a non-patent theory failed because, for example, McClellan testified that if Storms attempted to use his alleged arbitrage method (which, as described further below, is the allegedly non-patent-covered information converted by Defendants), he *may **infringe*** the '433 patent. Appx86-87 (citing Appx8063 at 231:18-232:1). The court found this admission, combined with Plaintiffs' other admissions (*e.g.*, Plaintiffs characterizing the filing of the '433 patent as an attempt to "monopolize" Storms' portion of the system he communicated (Appx87, Appx4260) and incorporating the inventorship allegations into the conversion claim (Appx86)), as well as Plaintiffs' attempt to recover patent-like royalty damages (Appx87-89, *see also* Appx1649-1650 at ¶¶6, 50, 87, 89-90 (providing numerous examples)) demonstrated that Plaintiffs' operative conversion theory, like its earlier conversion theory, is preempted and seeks patent-like protection. *See generally* Appx86-89.

## SUMMARY OF THE ARGUMENT

The district court correctly found that federal patent law preempted Plaintiffs' conversion claim. This Court should affirm. *First*, Plaintiffs' do not even address let alone rebut the evidence the district court relied on in finding preemption. *Second*, Plaintiffs' trial presentation relying on the arbitrage/sell-back aspects of the Data File as corroborating conception of certain claims (*e.g.*, claim 16) further

demonstrates the correctness of the district court's preemption ruling. *Third*, even if Plaintiffs could explain their inconsistent positions (*i.e.*, arbitrage/sell-back supporting conception of the '433 patent's inventions, while at the same time being unrelated to those inventions), Plaintiffs made the allegedly converted technology (the Data File) public and thus cannot now obtain "patent-like" protection for it. *Fourth*, the statute of limitations and Louisiana law provide two independent bases to bar Plaintiffs' conversion claim regardless of preemption. *Finally*, Plaintiffs cannot establish a basis for a new jury trial on inventorship. If accepted, Plaintiffs' no-preemption rationale confirms the inappropriateness of a new trial because, under Plaintiffs' rationale, inventorship would be a distinct issue from conversion.

Plaintiffs also cannot demonstrate the court abused its discretion by striking McClellan's "supplemental" expert report or by excluding portions of Storms' testimony. With respect to McClellan, Plaintiffs served the supplemental report without leave three weeks before trial. The report not only offered new opinions, but those opinions contradicted his earlier opinions, and Plaintiffs could not justify the late disclosure. The court properly excluded Storms' testimony regarding what he allegedly told McNamara during dinner because such communication directly related to establishing Plaintiffs' claims. Plaintiffs also have not and cannot establish harm because, *inter alia*, their own expert did not rely Storms' deposition testimony of the dinner conversation in forming his opinions.

Finally, Plaintiffs invite the Court to reweigh the evidence and reevaluate the district court's credibility determinations by arguing a host of alleged analysis errors. The court correctly analyzed the evidence, correctly applied the rule of reason, and did not hold Storms' purported evidence to an improper standard. Instead, the court critically examined the testimony and evidence, including making numerous credibility findings against Plaintiffs, and correctly concluded that Plaintiffs failed to clearly and convincingly prove Storms was the sole inventor, or a joint inventor, of the '433 patent. There is no error, let alone clear error. This Court should not reweigh the fact-finder's decisions.

## **ARGUMENT**

### I.   **Standards of Review**

Plaintiffs' statement of the standards of review is incomplete. "Inventorship is a question of law based on underlying facts." *Blue Gentian, LLC v. Tristar Products, Inc.*, 70 F.4th 1351, 1358 (Fed. Cir. 2023). This Court "review[s] the district court's overall inventorship determination de novo, and the court's underlying factfindings for clear error." *Id.* "[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Andino v. Nicholson*, 498 F.3d 1370, 1372 n.1 (Fed. Cir. 2007). "The burden of overcoming the district court's factual findings is, as it should be, a heavy one." *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322,

26

1328 (Fed. Cir. 2020). "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Hospira*, 946 F.3d at 1328, quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

## II. The District Court Properly Found Plaintiffs' Conversion Claim Preempted and, Regardless, the Statute of limitation Bars the Claim, as does Louisiana Law.

### A. Plaintiffs' conduct demonstrates that they consider the conversion claim to be encompassed by the '433 patent.

This Court should affirm the district court's preemption ruling. To begin, Plaintiffs do not rebut or even address any of the findings the district court relied on in finding preemption. Appx86-87. For example, the court relied on McClellan's proclamation that BearBox is barred from using its allegedly converted power arbitrage method because it "***might be infringing*** the ['433] patent anyway."[5] *Id.* Plaintiffs do not disavow this proclamation, or the court's reliance on it. Plaintiffs, likewise, do not address the court's other reasons for finding preemption (*e.g.*, that Plaintiffs' conversion claim incorporates their inventorship claims by reference, or that they sought to recover patent-like damages). Appx87-89. These failures alone warrant affirmance.

Plaintiffs' description of the allegedly converted technology and continued reliance on the arbitrage/sell-back concepts allegedly disclosed in the Data File as

---

[5] All emphases added unless otherwise noted.

evidence Storms conceived the '433 patent's claims (*e.g.*, claim 16) further support preemption. *Compare* Appx2722 at ¶9 (describing the allegedly converted technology as "a system that utilizes a set of Bitcoin miners under the direction of a control system" that will "periodically determine mining profitability" and "may either instruct some or all of the miners to mine Bitcoin or sell power back to the grid (power arbitrage)" *with* Appx148 (claim 16), *see also* Appx8098 at 367:13-369:14 (McClellan testifying the Data File "communicated" the "performance strategy" of claim 16), Appx7113 (arguing that the Data File described "a performance strategy using breakeven and revenue generation calculations" as claimed in claim 1, element [d]), Br. at 52-53 (identifying findings of fact ¶¶35, 37 (Appx11-12) as relating to Storms' "conception," when those finding relate to arbitrage/sell-back).

Plaintiffs' post-trial briefing further illustrates Plaintiffs' continuing to conflate arbitrage/sell-back and the '433 patent:

> Storms conceived of and developed a software-based system that would give a windfarm operator (a type of 'power entity' according to the '433 Patent) the option of selling power to a Bitcoin miner or selling power to the grid. Using this software, the windfarm operator would supply electricity to the Bitcoin miner when it made economic sense to do so, but would have the option to divert electricity from the miner to sell at the 'locational marginal price' on the electricity grid. This system, illustrated in the annotated diagram …, is what Lancium claimed in the '433 Patent.

Appx7219. Plaintiffs cannot now walk back their admissions and strategic choices throughout the case to resurrect their conversion claim.

The *University of Colorado* case does not compel a different result. There, plaintiffs based their state law unjust enrichment claim on the defendant copying their confidential materials into a patent. *Univ. of Colorado Found., Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1306-07 (Fed. Cir. 2003).[6] Here, conversely—numerous admissions otherwise notwithstanding—Plaintiffs assert that their conversion claim "is based on the theft of material that is *not* included in the '433 Patent." Appx4282 (emphasis original). Also, there, the court found that plaintiffs' claim was not preempted because the damages sought "were specifically limited to the incremental profits Cyanamid wrongfully made by obtaining the patent and did not encompass total profits Cyanamid made by selling a product incorporating the Doctors' invention" and because they were "not attempting to enforce patent-like rights *before* issuance of a patent." *Id.* at 1307 (emphasis original). Here, Plaintiffs' desired damages are not so limited. *See supra* p.24. Moreover, there, unlike here, the information taken was confidential (discussed in more detail below). Finally, there, unlike here, the court found that Plaintiffs were the true inventors. *Id.* at 1308-09.[7]

---

[6] Plaintiffs cite *University of Colorado Found., Inc. v. American Cyanamid Co.*, 196 F.3d 1366 (Fed. Cir. 1999), an earlier appeal in the same case.

[7] Plaintiffs' reliance on *Wawrzynski v. H.J. Heinz Co.*, 782 F.3d 1374 (Fed. Cir. 2013) is also misplaced. In *Wawrzynski*, this Court concluded that it did not have jurisdiction over an appeal of summary judgment on state law claims where "the complaint does not present a well-pleaded patent law issue." *Id.* at 1375–76, 1381.

**B.     Even if the conversion claim is not encompassed by the '433 patent the Court should still affirm.**

Even if the Court accepts Plaintiffs' current assertion that the allegedly converted material is not encompassed by the '433 patent, the Court should still affirm. The application of a "state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large impermissibly contravenes the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156-57 (1989). Thus, "[a]bsent secrecy, state law cannot create a collateral set of rights available as an adjunct or expansion to patent rights." *Ultra-Precision Mfg., Ltd v. Ford Motor Co.*, 411 F.3d 1369, 1379 (Fed. Cir. 2005).

Recognizing as much, Plaintiffs' pleaded their conversion claim as limited to "confidential Bearbox technology." Appx1650 at ¶88. But Plaintiffs concede four of the five attachments to Storms' Email, including the Spec Sheet and Diagram, were publicly available and not confidential. Appx76, Appx2660 at ¶18, Appx4290 at

---

Jurisdiction and the "well-pleaded complaint" rule are not issues here.

¶18, Appx2950 at 247:10-248:6, Appx8039 at 136:2-11, Appx13353.[8] The Data File is thus all that remains on which Plaintiffs can rely. Appx8037 at 128:2-5, Appx76, Appx2660 at ¶18, Appx4290 at ¶18.

The record demonstrates, however, that the Data File did not contain confidential information or technology. First, Plaintiffs' expert McClellan acknowledged the non-confidential Spec Sheet and Diagram disclose "the overall concept" of the allegedly converted technology. Appx6167-6168 at 229:24-231:9. Second, Storms disclosed a substantially similar data file with the same fields of information plus part of his source code to third-party Todd Garland ("Garland") without any confidentiality restriction. Appx2939 at 72:18-23, Appx2945-2946 at 186:17-189:2, 189:13-191:2, Appx2963-3030, Appx5751-5753, Appx8033 at 112:2-7, Appx8043 at 151:10-17, 151:23-152:2, Appx13408-13409, Appx13411-

---

[8] Plaintiffs do not contend that Defendants converted anything that Storms allegedly told McNamara, nor could they because a claim for conversion under Louisiana law can apply only to "goods" or "chattel" (*i.e.*, corporeal movable property). *See Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La. 1985); *Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So.2d 853, 857 (La. 1998); *Dorsey v. Money Mack Music, Inc.*, 304 F. Supp. 2d 858, 866 (E.D. La. 2003); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, No. 11-00556, 2014 WL 6674034, at *6 (M.D. La. Nov. 24, 2014); *BASF Agrochemical Prods. v. Unkel*, No. 05-1478, 2006 WL 3533133, at *7 (W.D. La. Dec. 7, 2006). Plaintiffs also do not contend that Defendants converted anything contained in the text messages between Storms and McNamara. Appx6166 at 223:21-234:17.

13447.[9] Third, Storms also disclosed the spreadsheet to counsel for a third party without restriction. Appx8044 at 155:25-157:6, Appx13371-13396.

Furthermore, the "breakeven" and "sell-back" concepts in Storms' Data File were well-known long before Storms and McNamara met. Appx8023 at 72:8-73:14 (discussing Appx9444-9453, Appx13566-13567), Appx8160-8162 at 610:8-619:10 (discussing Appx13566-13567), Appx8024 at 74:6-13 (discussing Appx9454-9455), Appx8056 at 204:24-205:12.[10] And to the extent Plaintiffs argue that the particular "sell-back" calculations are what was converted, McClellan admitted the hard-coded Data File *did not teach Storms' specific method*, but only provided "information upon which to embark on a reverse engineering exercise" that "would be *fraught with error*." Appx36, Appx8100 at 374:21-375:5, Appx8105 at 396:1-397:16. Storms, too, admitted that the Data File "doesn't contain any of the

---

[9] Although Storms' emails to McNamara and Garland included a footer saying they "may contain private, confidential, or legally privileged information" (Appx13323, Appx13409), such a footer was included on all his emails (Appx8037 at 127:17-128:1, Appx2939 at 72:4-9) and, in any event, is not sufficient to make the materials confidential. *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, No. 17-1295, 2022 WL 980791, at *10 (W.D. Tex. Mar. 31, 2022); *Sortiumusa LLC v. Hunger*, No. 11-1656, 2013 WL 11730655, at *11-12 (N.D. Tex. Mar. 31, 2013).

[10] Defendants were also well aware of breakeven Bitcoin mining calculations before meeting Storms (Appx8123-8125 at 468:20-471:1, 472:6-473:4, Appx11567-11568, Appx8126 at 477:18-20, 478:12-479:2, Appx11734), and the "sell-back" concept was included as a default provision in Calpine's standard electricity contracts. Appx28-29 at ¶88, Appx8152 at 576:1-577:6, Appx12466-12471, Appx9362.

mathematics that reveal the algorithm underl[y]ing these calculations. Appx8040 at

139:17-140:12. And Garland, to whom Storms sent a nearly identical data file, could

not decipher the breakeven formula, asking "What do you factor into the break-even

mining costs?" Storms, in response, had to provide his source code to show the

calculations. Appx8043 at 151:10-152:2, Appx13408-13409.

### C.    This Court should affirm the district court's dismissal of Plaintiffs' conversion claim on two other, independent grounds.

In addition to being preempted, the Court should affirm summary judgment

on Plaintiffs' conversion claim on two alternative grounds. *See Aventis Pharma*

*S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1343 (Fed. Cir. 2011).

### 1.    The statute of limitations bars Plaintiffs' conversion claim.

Under Louisiana law, a conversion action sounds in tort and is subject to a

one-year liberative prescriptive period. *Bihm v. Deca Systems, Inc.*, 226 So.3d 466,

480 (La. App. 1 Cir. 8/8/17). The prescriptive period begins to run "upon whatever

notice is enough to excite attention and put the injured party on guard or call for

inquiry." *Bihm*, 226 So.2d at 480; *Guillot v. Doughty*, 142 So.3d 1034, 1046 (La.

App. 1 Cir. 3/21/14).

Plaintiffs first pled the operative conversion claim on February 16, 2022.

Appx1649-1650, Appx1727-1729. Plaintiffs, however, admit they "became aware

of [Lancium's] wrongful use of BearBox's technology on or about August 17,

2020," when they learned through an August 14, 2020 press release that Lancium had sued third-party, Layer1.[11] Appx1642 at ¶¶52, 54. Plaintiffs argue they did not become aware of the specifics of the operative conversion claim until receiving documents in discovery in this case. Appx4272. But Storms' ***trial testimony*** demonstrates otherwise:

> Q. So at the time of the Layer1 suit, you were aware of ***the allegations you're asserting in this case***, it just took you a while to bring this lawsuit, is that fair?
>
> A. ***That's fair***.

Appx8046 at 162:2-25, Appx13565. Storms thus admits he was aware of the allegations he is asserting in this case (including conversion) by August 2020 (over seventeen months before Plaintiffs filed the SAC asserting the operative conversion claim). Regardless, Plaintiffs' admitted knowledge of the Layer1 case was enough to "excite attention" and put them on inquiry notice. The conversion claim is time barred. *Bihm*, 226 So.2d at 480; *Guillot*, 142 So.3d at 1046.

Plaintiffs will argue this admission is of no moment because the current conversion claim relates back to their original claim. Appx79-84. Plaintiffs are mistaken. The new conversion claim cannot relate back because there is no legally

---

[11] *Lancium LLC v. Layer1 Technologies, Inc.*, Case No. 6:20-cv-739 (W.D. Texas)

viable claim to which it can relate back.[12] "[T]he relation back theory assumes that there is a legally viable claim to which the pleading can relate back." *Naghi v. Brener*, 17 So.3d 919, 925 (La. 2009). But Plaintiffs' originally pled conversion, unjust enrichment, and negligent misrepresentation claims were dismissed, and Plaintiffs did not challenge these dismissals. Appx1622, Appx1630. Plaintiffs also withdrew their trade secret misappropriation claims based on the admitted "public disclosure" of the alleged trade secrets. Appx13653 at 21:11-20. Thus, there is no legally viable to which Plaintiffs' conversion claim can relate back. *See Safe Air Technology, LLC v. Christie*, No. 2017-0320, 2017 WL 4082243, at *8, *11 (La. App. 1 Cir. 9/15/17) (claims cannot relate back to earlier pled dismissed claims); *Snavely v. Ace Pain Management, LLC*, No. 15-903, 2016 WL 454952, at *7 (La. App. 3 Cir. 2/3/16) (similar).

Additionally, the new conversion claim does not relate because it arises out of different conduct. To relate-back, a later pleaded claim must "arise[] out of the same conduct, transaction, or occurrence" as the earlier claim. *Rapides Parish School Board v. Zurich American Insurance Co.*, 279 So.3d 981, 992-93 (La. App. 3 Cir. 8/21/19). Because the district court considered the alleged "theft" to be "in

---

[12] The district court did not previously address this issue. Nor did the court address whether Plaintiffs' knowledge of the Layer1 lawsuit provided at least inquiry notice of the current conversion claim. Appx79-84.

May 2019" (*i.e.*, when Storms' Email was sent) it concluded that the conducting supporting Plaintiffs' original and new conversion claims was "identical." Appx82. That was incorrect. The conduct underlying Plaintiffs' original claim was Defendants' "wrongful conduct in obtaining the '433 Patent and claiming the BearBox Technology as their own." *See* Appx204 at ¶62. Plaintiffs allege the conduct supporting the new conversion claim is Defendants' alleged use of BearBox's technology "to modify their Smart Response$^{TM}$ software." Appx1650 at ¶87. This is different conduct.

The *Rapides* case is instructive. There, plaintiff sued its building contractor for design and construction defects in the insulation and sprinkler system of a school, which caused water damage. *Rapides*, 279 So.3d at 983. Plaintiff filed a second amended complaint adding additional defects and damages (*e.g.*, relating to masonry and electrical systems) that it discovered after the prescription period had run (*id.* at 983), and argued the additional claims arose out of the same "transaction" (*i.e.*, the duties imposed by the same contracts for design and construction of the school) and thus related back to the original complaint. *Id.* at 986-87. Despite finding the new claims were based on the same contracts and construction as the earlier pled claims, that the earlier pled claims "**should have** put Defendants on notice of the allegedly faulty design and construction of the entire school," and that the "equities are in favor" of the plaintiff (*id.* at 994 (emphasis original)), the court found the new claims

time barred because they were based on "new factual allegations" and "new 'operative facts.'" *Id.* at 987.[13] The same applies here.

### 2. Plaintiffs' conversion claim fails because it was not deprived of any property

Plaintiffs' conversion claim also fails as a matter of law because its allegations do not—and cannot—state a claim for conversion. Under Louisiana law, conversion is "an act in derogation of the plaintiff's ***possessory*** rights, and any wrongful exercise or assumption of authority over another's goods, ***depriving him of the possession***, permanently or for an indefinite time." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La. 1985). But as the district court correctly found, Plaintiffs "agree that BearBox retained copies of electronic documents even after they were allegedly converted by Lancium." Appx5961, *see also* Appx1649-1650 at ¶¶84-90, Appx2339.

The *CamSoft* case is instructive. There, the plaintiff alleged defendants were liable for conversion based on the alleged "ongoing use of CamSoft's confidential and technical business information" that included "device compilations, software code, know-how, networking designs, installation process, business methods,

---

[13] In denying summary judgment, the district court relied on *Clark v. East Baton Rouge Parish Dep't of Public Works*, 196 So.3d 142 (La. App. 1 Cir. 6/3/16) in finding Plaintiffs' new claim related back. Appx81. But *Clark* is inapposite because there, unlike here, the amended claims alleged the same harm caused by the same source as alleged in the original claims and thus related back. 196 So.3d at 148.

marketing plans, pricing information, and strategic wireless network integrator business plans." *CamSoft Data Systems, Inc. v. Southern Electronics Supply, Inc.*, No. 2019-0731, 2019 WL 2865359, at *1, *3 (La. Ct. App. July 2, 2019), *writ denied*, 282 So.3d 1071 (La. 2019). The court, however, granted summary judgment finding that "CamSoft was not deprived of its confidential business information" and "a *conversion requires a deprivation of possession*." *Id.* at *3.

Although the district court denied Defendants' motion to dismiss Plaintiffs' conversion claim on this ground, this denial misunderstands Louisiana law on this issue.[14] Appx5962-5964. To reach its decision, the court relied on *Dual Drilling Co. v. Mills Equip, Invs., Inc.*, 721 So.2d 853, 857 (La. 1998), which provides seven examples of conversion, some of which the court believed did not require deprivation. Appx5961-5962. But under each example the owner would be deprived of possession of the property in the condition in which it existed before being

---

[14] This Court applies regional circuit law to the review of motions to dismiss for failure to state a claim under Rule 12(b)(6), here, the Third Circuit. The Third Circuit reviews de novo a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Endo Pharm. Inc. v. Teva Pharm. USA, Inc.*, 919 F.3d 1347, 1352 (Fed. Cir. 2019).

converted[15] because, as *Dual Drilling* explained, conversion "is available to an owner ***dispossessed*** as a result of an offense or quasi-offense." 721 So.2d at 857. There, the plaintiff was deprived of possession of its converted oil rig that was dismantled and sold for scrap. *Id.*

This interpretation of *Dual Drilling* is supported by *Importsales, Inc. v. Lindeman*, 92 So.2d 574 (La. 1957), which *Dual Drilling* relies on for its seven examples of conversion. There, the Louisiana Supreme Court explained that "[t]he gist of a conversion has been declared to be not the acquisition of the property by the wrongdoer, but the *wrongful deprivation* of a person of property to the possession of which he is entitled. A conversion consists of an act in *derogation of the plaintiffs' possessory rights*, and any wrongful exercise or assumption of authority over another's goods, *depriving him of the possession*, permanently or for an indefinite time, is a conversion." *Importsales*, 92 So.2d 574, 575–76.

The Louisiana Supreme Court repeatedly emphasizes the deprivation requirement. *Edward Levy Metals, Inc. v. New Orleans Public Belt R.R.*, 148 So.2d 580, 582 (La. 1963) ("It is well settled … that it is not the erroneous accumulation

---

[15] Even interference with ownership rights requires deprivation to constitute conversion. For example, in *Commercial Flooring & Mini Blinds, Inc. v. Edenfield*, 138 So.3d 30 (La. App. 1 Cir. 2/14/14) the court found that selling a business in which the plaintiff had an ownership interest (and thereby depriving them of possession) "seriously interfered with [plaintiffs'] ownership rights" and thus "clearly meet[s] the definition of conversion." *Id.* at 39.

of property by the wrongdoer which gives rise to the delictual responsibility, but the wrongful deprivation of a person of property to the possession of which he is entitled."); *Quealy*, 475 So.2d at 760. Thus, although the Louisiana Supreme Court has not directly addressed a conversion claim where the owner's deprivation was in dispute, it has indicated how it would decide the issue of deprivation. *See Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009) ("a federal court applying [a] state's substantive law must predict how [that state's] highest court would decide th[e] case"); *see also MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1359 (Fed. Cir. 2005).[16]

The Fifth Circuit, likewise, counsels a deprivation requirement under Louisiana law. For example, in *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, it explained that "to prevail against [defendant], [plaintiff] *must prove* that (1) it owned funds misused by him; (2) the misuse was inconsistent with its rights of ownership; *and (3) the misuse constituted a wrongful taking* of the funds." 783 F.2d 480, 484 (5th Cir. 1986); *accord Tri-state Bancshares, Inc. v. Scott*, No. 15-2053,

---

[16] The *Mabile v. BP, P.L.C.,* No. 11-1783, 2016 WL 5231839 (E.D. La. Sept. 22, 2016) decision does not compel a different result. *Mabile* is non-controlling precedent that pre-dates *Camsoft*, a Louisiana appellate court decision. *See MicroStrategy*, 429 F.3d at 1359 ("when a state court has decided a matter of state law, as in the present case, federal courts should pay careful attention to the state court decision"); *see also Litton Indus. Prod., Inc. v. Solid State Sys., Corp.*, 755 F.2d 158, 165 (Fed. Cir. 1985) ("If there is no decision by the state's highest court, proper regard should be given relevant rulings of other courts of that state.").

2016 WL 4098604, at *4 (W.D. La. July 28, 2016) (quoting *Chrysler Credit*). Put simply, the misuse of property inconsistent with the owner's right of ownership by itself is not sufficient for conversion.

## III. Plaintiffs Are Not Entitled to a Retrial on Their Inventorship Claims.

Plaintiffs argue for a "do-over" because the court's purported improper dismissal of the conversion claim deprived them of a jury trial on "common factual issues such as … whether BearBox communicated anything of value to Lancium … or whether he [Storms] merely communicated documents reflecting prior art methods." Br. 37-38. But "communicated anything of value" is not the legal standard for either conversion or inventorship. Under Plaintiffs' no-preemption rationale, the conversion claim and the inventorship claims do not share common issues. Accordingly, even if the Court vacates the district court's grant of summary judgment on the conversion claim—which it should not—it would not affect the inventorship rulings or judgment.

Plaintiffs' cited case *Shum v. Intel Corp.*, 499 F.3d 1272 (Fed. Cir. 2007) actually supports Defendants' argument. There, the plaintiff, *inter alia*, asserted claims for correction of inventorship and a claim for fraud based on his former business partner's filing of a patent application on technology the plaintiff claimed he invented. *Shum*, 499 F.3d at 1275. Critically, "Shum's fraud claim was based, in part, on his assertion that Vierdiell [his former partner] made misrepresentations to

41

the Patent and Trademark Office and third parties that he was the sole inventor of the patents in suit." *Id.* at 1277. Shum admitted on appeal that "[o]nce the district court decided that Vierdiell, and not Shum, had truly invented the technology, th[e] fraud claims were eviscerated" and "[i]f this Court affirms the district court's inventorship ruling, Shum's arguments that Vierdiell misrepresented or concealed the true inventor of the technology necessarily fail." *Id.* at 1278. Thus, in *Shum*, there was "commonality" between the inventorship and fraud claims that required resolution by a jury because the fraud claim was dependent on a determination of inventorship.

Here, however, Plaintiffs' no-preemption argument destroys the theory under which the relief sought depends. To avoid preemption, Plaintiffs repeatedly argue their "conversion claim does not require a determination of patent inventorship." Br. at 37; *see also* Appx4282 (asserting their "conversion claim is based on the theft of material that is *not* included in the '433 Patent." (emphasis original)), Appx6182 at 286:8-14. Plaintiffs' cannot have it both ways.

Defendants recognize, as argued above, that Plaintiffs also made (and make) admissions that the allegedly converted technology is contained within the '433 patent. *See supra* at pp.27-28. Ultimately, if this Court affirms the district court's preemption ruling, which it should, the issue of a new trial is moot. But if the district court does not affirm preemption, Plaintiffs' rationale demonstrates that a new trial

42

is not appropriate. *See Shum*, 499 F.3d at 1279 (a jury trial on equitable claims is not required even if there is "overlap in consideration of some aspects of the same relevant evidence" with co-pending legal claims, so long as the claims "do not involve a common issue"), quoting *Afga Corp. v. Creo Products, Inc.*, 451 F.3d 1366, 1372 (Fed. Cir. 2006).

## IV. The District Court Did Not Abuse Its Discretion in Striking McClellan's Supplemental Expert Report.

The district court properly struck McClellan's "supplemental" report. Plaintiffs' arguments to the contrary lack merit.

### A. Plaintiffs' timeliness and waiver argument lack merit and are moot.

Plaintiffs argue McClellan's untimely "supplement" was justified because Defendants raised an untimely claim construction dispute. Not so. The district court properly rejected this argument finding that "both BearBox and Dr. McClellan were equipped with Lancium's proposed constructions ***six months*** prior to supplementing Dr. McClellan's reports" when Defendants' expert Dr. Ehsani served his rebuttal report. Appx95-96, *see also* Appx6639-6653 at ¶¶42-43, 107, 109, 116-117. Plaintiffs' counsel admits, moreover, "both sides reserve[d] the right to request claim construction in the future if necessary." Appx13835 at 32:10-12. Additionally, McClellan "acknowledged that he and Lancium's expert disagreed on the plain and ordinary meaning of the disputed terms." Appx96, Appx2858-2859 at ¶86. As such,

43

he "had an obligation to address Lancium's arguments and analysis related to the plain and ordinary meaning of these disputed terms" in his reply report. Appx94-95 (citing *St. Clair Intellectual Prop. Consultants, Inc. v. Matshushita Elec. Indus. Co., Ltd.*, No. 04-1436, 2012 WL 1015993, at *5 (D. Del. Mar. 26, 2012); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 270 F. Supp. 2d 519, 524 (D. Del. 2003)). That McClellan failed to do so, and that Plaintiffs instead waited until the eve of trial to offer new McClellan opinions, are problems of their own making.[17]

## B.    The district court correctly found that McClellan's "supplemental" report contained new opinions.

Plaintiffs next attack the district court's decision by arguing that McClellan's "supplemental" report did not offer new opinions, only "elaborations," "clarifications," and "further detail" on existing opinions. Br. at 40. This argument is spurious.

The '433 patent describes and claims systems and methods that, *inter alia*, help stabilize the power grid by utilizing "a power option agreement" and a "set

---

[17] Despite not challenging the court's construction, Plaintiffs argue Defendants somehow waived their right to claim construction. Br. at 39. Incorrect. A party can raise a claim construction dispute up to and including at trial. *See*, *e.g.*, *GPNE Corp. v. Apple, Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016). As such, this case where the parties had not previously briefed claim construction and there had been no claim construction ruling is different than *Central Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) on which Plaintiffs rely.

of minimum power thresholds" to give the power entity the ability to balance power supply with demand. The claimed system does this by giving a power entity (such as a grid operator) the "option" (through a "power option agreement") to control a load by giving the power entity the ability to instruct the load to reduce the amount of power it is using (*i.e.*, "curtail" the load). Appx140 at 43:46-44:35, Appx148-149 at 59:2-62:38. The court's claim construction confirms this understanding. *See supra* at p.9; Appx6021.

McClellan did not provide any analysis or explanation in his reports of his understanding of what the "plain and ordinary meanings" actually were (*see* Appx2734 at ¶¶48-49), and Plaintiffs do not assert otherwise. Br. at 40-41. But McClellan did explain his understanding (or lack thereof) of the plain and ordinary meanings during his deposition. For example, McClellan testified that he considered *the load* to hold the option in the "power option agreement," and that a "power option agreement" was "essentially a contract to buy power at a certain price. It's like a wholesale purchase. I'm going to buy X number of units at X price." Appx6131 at 83:5-10. He also testified that a "power option agreement" *did not require* that the purchaser (*i.e.*, the load) actually use that power. *See* Appx6149 at 157:1-18 ("I'm going to pay for that power, that's the option. When it comes time, I'm going to pay for that whether I use it or not. *I don't have to use it*."). Thus, as the district court correctly found, McClellan's opinion in his supplemental report that Storms

45

conceived of a system where ***the power entity*** held the option to reduce the amount of power used by a load was more than "mere 'elaboration' or 'clarification,'" it was a new opinion. Appx93-94, Appx6105-6106 at ¶¶25-26.

McClellan's deposition testimony similarly made clear that his interpretation of "minimum power threshold" did not require the load to actually use the power, but instead the load could "consume" it, which McClellan understood to mean either use it or sell it back. Appx6131-6132 at 84:18-85:1, 87:16-88:17. McClellan even tried to defer to Plaintiffs' ERCOT expert (McCamant) for the plain and ordinary meaning of these terms. Appx6133 at 90:14-92:24. McCamant, however, had not even read the '433 patent and did not offer any opinions regarding the meanings of its claim terms. Appx5678 at 16:7-17. At the *Markman* hearing, Plaintiffs' counsel also acknowledged McClellan held a different view of "minimum power threshold," explaining "[h]e's reading the patent more broadly in terms of what the power can be used for." Appx13828 at 25:12-17.

Based on these and other admissions, the district court correctly found that McClellan's "supplemental" opinion was not merely providing "elaborations" or "clarifications" of his earlier opinions; rather, it "advanced untimely new legal theories and opinions which would ultimately prejudice Lancium, especially at this juncture of the case." Appx94 (citing Appx6105-6106 at ¶¶25-26), *see also* Appx6005-6020, Appx2629-2636, Appx5618-5624.

Plaintiffs assert a variety of additional, meritless arguments attempting to save McClellan's "supplemental" report. Each fail. First, Plaintiffs stretch McClellan's original and reply reports beyond their breaking point in an attempt to demonstrate those opinions were consistent with his "supplemental" report. Br. at 41 (cherry picking isolated statements that the fixed "kw_load" value in BearBox's source code and "real_time_LMP_rev" column in the Data File indicate the system could use power). These snapshots, however, do not undue McClellan's overall testimony, and do not explain how Plaintiffs' system received "minimum power thresholds" specifying amounts of power that the system ***was required to use*** during specific intervals as required by the claims of the '433 patent because, as the district court correctly found, McClellan did not offer such an opinion or analysis. Appx94.

Next, Plaintiffs attempt to dismiss the district court's consideration of McClellan's deposition testimony as relying on a single "confused deposition quote." Br. at 42. This borders on bad faith. McClellan's voluminous testimony demonstrates that his original understanding of the plain and ordinary meanings of "power option agreement" and "minimum power thresholds" was vastly different from the understanding and new opinions he attempted to provide in his supplemental report. Appx2629-2636, Appx5618-5624, Appx6131-6149 at 83:5-85:8, 87:2-88:17, 90:2-91:24, 155:13-157:18. And, contrary to Plaintiffs' argument, the district court adequately explained its reasoning; it need not cite every instance

47

of McClellan's testimony that supports its ruling. *See Medtronic, Inc. v. Daigle Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise."); *General Electric Co. v. Wilkins*, 750 F.3d 1324, 1331 (Fed. Cir. 2014) ("A district court need not write an opinion that expressly discusses every admitted exhibit."). Put simply, the district court's finding that McClellan offered new opinions is much more than "plausible" and thus was not an abuse of discretion. *Lindy Bros. Builders, Inc. of Philadelphia v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976).

## C. The district court properly considered and applied the *Pennypack* factors.

Plaintiffs next argue the district court abused its discretion in weighing the *Pennypack* factors. The court's reasoned analysis, however, was far from an abuse of discretion.

First, Plaintiffs' dispute the district court's finding that "BearBox's disregard of the express terms of the Court's Scheduling Order indicates bad faith." Appx95. But the scheduling order set out the expert report deadlines and explicitly stated that "[n]o other expert reports will be permitted without either the consent of all parties or leave of the Court." Appx95. Plaintiffs, nonetheless, served McClellan's "supplemental" report without seeking Defendants' consent or leave of the court.

Appx95. The court was thus well within its discretion to find this "indicates bad faith." Appx95.

The record further supports the court's "bad faith" conclusion. As discussed above, McClellan's reply report acknowledged his claim construction dispute with Defendant's expert Dr. Ehsani, but made no attempt to explain how BearBox's system taught the claimed systems and methods under Dr. Ehsani's interpretation of the claims. Appx95-96, Appx2858-2859 at ¶86, Appx6639-6653 at ¶¶42-43, 107, 109, 116-117. Plaintiffs, instead, waited over five months after issuing McClellan's reply report—until three weeks before trial—to issue his "supplemental" report. Appx95, Appx2827, Appx6095. Plaintiffs attempt to distinguish voluminous case law striking expert reports under such circumstances on the grounds they were "not on notice of a dispute" is, therefore, meritless. *See Praxair, Inc. v. ATMI, Inc*., 231 F.R.D. 457, 463-64 (D. Del. 2005), *reversed on other grounds by* 543 F.3d 1306 (Fed. Cir. 2008) (excluding supplemental expert report submitted after the close of expert discovery where trial was to begin in less than a month); *see also INVISTA N. Am. S.a.r.l. v. M&G USA Corp.*, No. 11-1007, 2013 WL 3216109, at *3-*4 (D. Del. June 25, 2013); *Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. 09-3125, 2011 WL 6722707, at *7 (D.N.J. Dec. 21, 2011). Moreover, this Court has found no abuse of discretion in striking similar "supplemental" expert reports. *See Suffolk Technologies, LLC v. AOL Inc.*, 752 F.3d 1358, 1366 (Fed. Cir. 2014) (affirming

exclusion of a portion of supplemental expert report offering new opinions after claim construction ruling, which "did not vary greatly from the parties' proposals" the expert knew at time of original report); *Cheese Systems, Inc. v. Tetra Pak Cheese & Powder Systems, Inc.*, 725 F.3d 1341, 1344 (Fed. Cir. 2013).

Second, the district court did consider the importance of the excluded report. It noted that if the supplemental report did not contain new opinions, as Plaintiffs asserted, then its exclusion would be harmless. Appx94. And it is apparent that the court concluded the alleged importance of the report did not outweigh the other four *Pennypack* factors, all of which strongly favored exclusion. Appx92-96. Furthermore, Plaintiffs' reliance on *Coalition to Save our Children v. State Board of Education of State of Delaware*, 90 F.3d 752, 790 (3d Cir. 1996) is misplaced. Br. at 48. Plaintiffs cite to the ***dissent*** in this case, which actually "conclude[d] that the district court did not abuse its discretion in excluding th[e] surprise [expert] testimony." 90 F.3d at 776.

Third, Plaintiffs' assertion that "Lancium could not be prejudiced" by the supplemental report served three weeks before trial simply ignores the substantial prejudice the district court found, including that "Lancium ha[d] no meaningful opportunity to conduct rebuttal discovery, prepare a supplemental rebuttal report, or prepare for an additional deposition." Appx96. And for the same reasons, any "lesser sanction" would not have cured this "uncurable" prejudice. *Id*. Moreover, the court

permitted McClellan to testify about how his opinions were allegedly consistent with the claim construction ruling (even though his reply report failed to respond to Dr. Ehsani's construction), concluding that any objections that such testimony was inconsistent with the district court's claim construction ruling "goes to credibility not admissibility." Appx8090 at 333:13-334:5, Appx8091 at 338:23-339:1.[18] The exclusion of McClellan's supplemental report, therefore, was not an abuse of discretion, much less reversible error.

## V.    The District Court's Inventorship Judgments Should Be Affirmed.

Plaintiffs hurl a hodge-podge of criticisms against the district court's rulings and analysis of the evidence in an attempt to get this Court to act as the fact-finder. Plaintiffs' criticisms lack merit.

Plaintiffs begin by overinflating the importance of the alleged inventor's testimony. Br. at 50-51. Would-be inventors' testimony, however, "is regarded with skepticism" (*Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993)) because they "may be tempted to mischaracterize the events of the past through their testimony." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006); *see also Transweb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1301 (Fed. Cir.

---

[18] McClellan also testified about the opinions in his original reports thus rendering Plaintiffs' complaint that the district court should have only stricken the portions of the supplemental report that offered new opinions meaningless. Appx92-97, Appx8073 at 267:6-13, Appx8070 at 260:17-261:13.

2016). Accordingly, "[a]n alleged co-inventor's testimony, standing alone, cannot rise to the level of clear and convincing evidence; he must supply evidence to corroborate his testimony." *Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1295 (Fed. Cir. 2008).

### A.    The district court correctly excluded Storms' hearsay testimony but did consider Storms' testimony.

Using this over-inflation as a springboard, Plaintiffs argue that the district court (i) erred in excluding portions of Storms' testimony as hearsay,[19] (ii) improperly relied on McNamara's testimony, and (iii) employed an improper, piecemeal analysis of Storms' allegedly corroborating documents. Br. at 51-53. These arguments lack merit.

### 1.    The court correctly excluded Storm's hearsay testimony.

Plaintiffs contend Storms' testimony about what he allegedly told McNamara was not hearsay because it "was not offered for the truth of the matter asserted, but only for the sake of proving notice and what information Storms communicated to Lancium." Br. at 51. Plaintiffs are mistaken.

The potential relevance of Storms' excluded testimony is as evidence of Storms' alleged conception or contribution to the conception of the inventions of the

---

[19] This Court reviews the district court's evidentiary rulings with extreme deference. *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1996).

'433 patent and communication of the same to McNamara, which Plaintiffs acknowledge. Br. at 51. But "[a]n inventor can't communicate something they haven't conceived of yet." *Blue Gentian,* 70 F.4th at 1364. Storms' testimony about what he told McNamara thus only has value if offered for its truth because otherwise it is not evidence of conception. It is classic hearsay.

Plaintiffs rely on *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954 (Fed. Cir. 2016) in an attempt to avoid this conclusion. But *REG* is distinguishable. There, this Court found that an email by an inventor to a third party, where the contents could not be disputed, was not hearsay because it was documentary evidence corroborating his testimony regarding his date of conception. *Id.* at 964. Here, the situation is much different. The court rightfully excluded Storms' attempt to testify regarding his own alleged out-of-court statements to McNamara that occurred many years earlier and only have significance if offered for their truth. Appx8025-8026 at 83:21-82:2.

But even if the district court erred in concluding that Storms' testimony was hearsay, the error was harmless. That Plaintiffs did not even make an offer of proof

to preserve the testimony for appeal demonstrates its lack of importance.[20] Appx8025-8026 at 79:24-82:12. Plaintiffs, even now, do not identify what Storms would have testified he told McNamara or why this was important. Br. 50-53. Plaintiffs' expert McClellan, moreover, **after** having reviewed Storms deposition and its full account of what he purportedly communicated to McNamara during dinner (Appx4691 at 84:10-85:2, Appx4693-4696 at 95:12-108:2), explained that he felt "it's unlikely that an enormous amount of pertinent information was communicated at the dinner" thus further highlighting the unimportance of Storm's dinner communications. Appx6157 at 186:24-187:20. Similarly, at trial McClellan did not rely on anything Storms' allegedly orally told McNamara (Appx8104 at 391:9-13), further reinforcing that Storms' excluded testimony had little or no probative value. Exclusion was, therefore, at most harmless error. *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1558 (Fed. Cir. 1983) (improper exclusion of evidence was harmless error because it was "of little or no probative value"); *Nat'l Presto*, 76 F.3d at 1197 ("Appellate review of evidentiary rulings is extremely restricted; it must be shown that there was manifest error, such as a reasonable

---

[20] "It is a bedrock principle of trial practice that, to preserve for appellate review a claim of error premised on exclusion of evidence, the aggrieved party must ensure that the record sufficiently reflects the content of the proposed evidence." *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998); *see also* Fed. R. Evid. 103(a)(2); *Ultratec, Inc. v. CaptionCall, LLC*, 287 F.3d 1267, 1274 (Fed. Cir. 2017); *Yost v. A.O. Smith Corp.*, 562 F.2d 592, 594 (8th Cir. 1977).

54

likelihood that the improper exclusion of evidence prejudiced the outcome."); Fed. R. Civ. P. 61.

### 2. The court properly analyzed McNamara's and Storms' testimony and the remaining evidence.

Plaintiffs argue the district court "compounded" its error by permitting and relying on McNamara's testimony about the substance of the "very same communications" with Storms. Br. at 52. This argument rings hollow. First, Plaintiffs waived this argument because they did not object at trial. *See* Appx1848 at 562:25-562:2; *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1372 (Fed. Cir. 2021); Fed. R. Evid. 103(a)(1). Second, the focus of the single question Plaintiffs cite was not the dinner conversation, but on communications more broadly as confirmed by the surrounding testimony. *See* Appx8148 at 562:22-563:12. Finally, the court did permit Storms to provide comparable testimony about the substance of their dinner conversation and the facts surrounding the dinner. Appx8026 at 84:12-23.

Next, Plaintiffs credit the court with citing "some of Storms' conception testimony," but then criticize it for allegedly not relying on that or other of Storms' testimony in the court's analysis of the alleged conception and communication of the claimed inventions. Br. 52-53. This argument is simply "sour grapes." The court is not required to identify every piece of evidence it relies on in reaching its

55

conclusions. *General Electric*, 750 F.3d at 1331; *Medtronic*, 789 F.2d at 906. Moreover, the findings of fact Plaintiffs cite (Appx11-12 at ¶¶ 35, 37) relate to testimony regarding Storms' model purportedly represented by the Data File, which, in turn, was purportedly supported by Storms' source code. *See* Appx8085 at 316:16-23. The court examined the opinions of the parties' respective experts (McClellan and Baer) regarding the functionality of that code, as well as Storms' testimony on cross-examination about that code, and concluded the code did not corroborate Storms' conception of the '433 patent. Appx13-16, Appx34-39. This analysis provides substantial evidence supporting the court's conclusion.

Plaintiffs also aver the court erred by allegedly reviewing Storms' purported corroborating documents one-at-a-time in isolation. Br. at 53. The record demonstrates otherwise. For example, Defendants' expert Dr. Ehsani analyzed the documents individually and collectively in reaching his opinions that Storms did not conceive or communicate the elements of the '433 patent. Appx8178 at 680:11-681:5, Appx8180 at 688:13-690:14, *see also* Appx8178-8180 at 681:6-688:11. The court's opinion, moreover, begins each section by identifying the documents collectively and then analyzing them. *See*, *e.g.*, Appx32-39 (¶99 (identifying Diagram, Spec Sheet, and Data File collectively and then analyzing them), ¶107 (same, and including source code), ¶111 (same)). Nothing more is required.

## B.    The district court properly analyzed the evidence regarding inventorship.

Plaintiffs' next attack—that the court allegedly erred in analyzing the claim elements in isolation—continues their piecemeal theme and fails for the same reason. The record demonstrates otherwise.

To begin, the court's purportedly erroneous analysis mirrors the analysis Plaintiffs present in their post-trial brief. *See* Appx7107-7120. This analysis stems from the burden of proof. To prevail on their sole inventorship claim, Plaintiffs must clearly and convincingly establish prior conception of the claimed subject matter and communication of the conception to the named inventor(s). *Price*, 988 F.2d at 1190; *Cumberland*, 846 F.3d at 1217‑18. Because Plaintiffs must demonstrate conception and communication of the inventions (*i.e.*, conception and communication of each claim), focusing the analysis on the claim elements is not surprising. Moreover, the court's analysis did consider the claims overall. The claim elements themselves build on each other. *See, e.g.*, Appx148 at claim 1 (*e.g.*, element [b3] referring to "monitored conditions" of element [b1] and "power option data" of element [b2]; element [b4] referring to "computing systems" of element [a] and "performance strategy" of element [b3]). The court's analysis of the claim elements likewise considered the interrelation of the claim elements and the inventions overall. *See, e.g.*, Appx32-39 at ¶¶99-114.

Continuing to lob criticism, Plaintiffs, relying on Appx31 (¶¶97-98), argue that the court's element-by-element analysis led it to erroneously credit Defendants with conceiving certain claim elements before Defendants' own asserted conception date. Br. 56-57. The court's findings in paragraphs 97-98 (Appx31), however, relate to claim element [b1] ("monitor a set of conditions"), not elements [b3] and [b4] as argued by Plaintiffs. Br. at 56-57. Defendants did earlier conceive and reduce to practice a system that monitored conditions, determined a performance strategy, and provided instructions based on that strategy as demonstrated in the '632 application and other exhibits (Appx8879-8922, *supra* pp.11-13) and discussed extensively by Cline during trial. *See, e.g.*, Appx8118 at 448:10-23. Defendants do not contend, however, and the court did not find, that the '632 application's system contained the "performance strategy" based on and "responsive to" received "power option data," including "minimum power thresholds," based on a "power option agreement" as claimed in the '433 patent.

Plaintiffs also criticize the district court's "prior independent conception" findings as based on "uncorroborated testimony" from a "purportedly credible witness"—Cline. Br. 57-59. This criticism is unfounded, and a naked request for this Court to second-guess the fact-finder's credibility determination. A review of the record reveals that the district court did not just consider Cline's testimony to reach its opinions on Defendants' independent conception. *See, e.g.*, Appx31 at ¶97 (citing

¶¶57-58). Moreover, Defendants provided numerous exhibits (Appx7163-7165, Appx7189-7196, *see also, e.g.*, TX163 (Appx9711-9754), TX594 (Appx12350), TX189-TX190 (Appx11411-11413), TX176-TX180 (Appx11394-11410), TX222-TX223 (Appx11567-11568), TX320 (Appx11639), TX501 (Appx12342-14343)) and testimony corroborating Defendants' independent conception. Appx8121-8128 at 457:18-487:7, *see also* Appx8115-8121, Appx8128-8134, Appx8142-8147, Appx8150-8153. A district court need not cite each piece of evidence it considered. *General Electric*, 750 F.3d at 1331; *Medtronic*, 789 F.2d at 906; *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Laboratories Inc.*, 923 F.3d 1368, 1377 (Fed. Cir. 2019) ("because we review the district court's decision for clear error, we will scour the record created below for evidence supporting the district court's … finding").[21]

## C.    The district court properly applied the rule of reason.

Plaintiffs' next criticism—that the court misapplied the rule of reason by not focusing on the evidence as a whole—is simply their earlier "piecemeal" arguments

---

[21] Plaintiffs' attack on Cline's credibility (Br. at 58) is a distraction. Cline did not change his testimony (*see* Appx8136 at 518:4-519:3) and, regardless, the district court repeatedly found Cline's testimony credible. *See* Appx17-31 at ¶¶56, 60, 90-91, 97. "[C]redibility determinations by the trial judge can virtually never be clear error." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1263 (Fed. Cir. 2001) (internal quotations and citations omitted); *see also In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 521 (Fed. Cir. 2012) ("This court may not reassess, and indeed is incapable of reassessing, witness credibility … on review." (internal quotations and citations omitted)).

re-repackaged. "[T]he sufficiency of corroboration [i]s a question of fact, with the district court's determination subject to review for clear error." *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014); *Blue Gentian*, 70 F.4th at 1358. There is no error, let alone "clear error" in the court's analysis.

To begin, Plaintiffs argument misunderstands the law. The corroboration requirement applies only to testimony by an alleged inventor. *See Price*, 988 F.2d at 1194-95; *see also Symantec*, 522 F.3d at 1295. "This court does not require corroboration where a party seeks to prove conception through the use of physical exhibits" because "[t]he trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577-78 (Fed. Cir. 1996) (internal citations omitted); *see also Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002). Because Plaintiffs' expert McClellan relied only on Storms' Email as communicating his alleged conception of the inventions of the '433 patent to Defendants (Appx7108, Appx7112-7116, Appx6157 at 186:24-187:20, Appx8104 at 391:9-13), other evidence purportedly corroborating Storms' conception (*e.g.*, source code and pictures)[22] are not relevant to corroborating the Email's teaching, or lack thereof. Storms' Email can only convey what it and its attachments

[22] It is undisputed these were never provided to McNamara, Cline, or Lancium.

themselves convey.

Nonetheless, the record demonstrates the court considered Plaintiffs' purported corroborating evidence as a whole. The court first made extensive findings of fact regarding witnesses and documents, including Plaintiffs' alleged "corroborating" evidence. Appx4-30 (¶¶6-92). For example, the court extensively analyzed Plaintiffs' source code—their primary "corroborating" evidence of conception (*see, e.g.*, Appx13-16, Appx34-38)—and contemporaneous communications with third parties like Hakes. *See*, *e.g.*, Appx10-12, Appx20-23. And Plaintiffs admit the court considered their allegedly "corroborating evidence, including photos of Storms' hardware and graphic interfaces." Br. at 60. The court also properly set forth the legal standard regarding the "'rule of reason' analysis, which requires evaluating all pertinent evidence …." Appx54.

Plaintiffs would have this Court find error because the district court did not write a final sentence stating that the evidence overall does not prove or corroborate Plaintiffs' claims. But the court's analysis indicates (consistent with Dr. Ehsani's opinion discussed above) that it considered the evidence collectively. Plaintiffs' argument puts form over substance. *See Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1569 (Fed. Cir. 1986) (rejecting asserting the district court did not consider evidence "as a whole" because it did not explicitly say so). That the court did not cite, discuss, or re-discuss each one of its factual findings regarding the

allegedly corroborating evidence for each one of its conclusion does not indicate error, let alone clear error. *Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1329 (Fed. Cir. 2004) (affirming the district court finding no corroboration where the district court "did not explicitly analyze" all alleged evidence); *see also General Electric*, 750 F.3d at 1331; *Medtronic*, 789 F.2d at 906.

Plaintiffs, as a "hail Mary," attempt to manufacture confusion by citing to two purportedly "contrary findings" relating to the court's treatment of Plaintiffs' PDU relays/user interface evidence. Br. at 60-61. The court's findings, however, were consistent. At trial and in deposition, Storms admitted his simulation did not use or intend to use PDUs (*e.g.*, the individual relays and graphic interfaces of the photos). Appx8045 at 158:11-160:16. Baer, likewise, testified that Storms' source code relating to the PDUs/user interface (Baer's category one of the source code) does not relate to Storms source code relating to the simulation (categories two and three), *i.e.*, the code that supported the Data File. Appx8168-8169 at 643:5-644:13. Claim element [b4] is part of the '433 patent's control system. Consequently, as the court explained, although the "graphic interface" (*i.e.*, the first category of source code) corroborates that the BearBox system could manually control PDU relays, it does not corroborate Storms' conception of element [b4].[23] Appx38 at ¶113.

---

[23] Plaintiffs argue in a footnote (Br. at 60) that turning all miners on/off satisfies element [b4]. This is wrong because [b4] provides instructions "based on the

## VI.    The Court Did Not Hold Plaintiffs' Evidence to a Heightened Standard.

Plaintiffs' final argument—that the district court erred by holding Storms' corroborating evidence to a heightened, reduction to practice standard (Br. at 62-65)—also fails.

Plaintiffs, for example, latch onto a sentence from the court's opinion indicating that Plaintiffs did not "proffer evidence establishing that the BearBox System could individually control the system of 272 miners" as exemplary of this alleged impropriety. Br. at 64. But it was Plaintiffs that argued the functionality of the system (*i.e.*, what it could do) evidenced conception. *See*, *e.g.*, Appx7116 (arguing "Storms' system" demonstrated conception because it "***compared*** mining profitability and ***instructed*** miners to mine Bitcoin when mining revenue was greater than the price of power from the power grid"). Thus, the court responding to Plaintiffs' argument does not indicate it held Plaintiffs' evidence to a higher standard.

At bottom, this argument, like all of Plaintiffs' arguments in Section IV(B-D) of their brief, is a disguised attempt to get this court to reweigh the evidence and the resulting factual findings. The court correctly set forth the legal standards for

---

performance strategy" of [b3]. Also, as the court noted, Defendants had conceived of a system that could turn on/off individual miners and groups of miners (and much more) one and one-half years before McNamara met Storms. Appx38-39.

inventorship claims, which focus on conception. *See* Appx52-56. The court thoroughly considered and weighed the evidence, and made detailed, well-reasoned findings that Plaintiffs did not provide clear and convincing evidence of conception and did not communicate the non-conceived inventions to Defendants. That Plaintiffs do not agree with the court's findings, is not error, let alone clear error. *Hospira*, 946 F.3d at 1328 ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.").

## **CONCLUSION**

For all of the foregoing reasons, Defendants-Appellees request that this Court affirm the district court's final judgments.

Date: October 4, 2023            Respectfully submitted,

/s/ *Mark C. Nelson*

Mark C. Nelson
Barnes & Thornburg LLP
2121 North Pearl Street, Suite 700
Dallas, TX 75201
Direct: 214-258-4140
Email: mark.nelson@btlaw.com

Adam M. Kaufmann
Barnes & Thornburg LLP
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Direct: 312-214-8319
Email: adam.kaufmann@btlaw.com

Chad S.C. Stover
Barnes & Thornburg LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Direct: 302-300-3474
Email: chad.stover@btlaw.com

*Counsel for Defendants-Appellees*
*Lancium LLC, Michael T. McNamara,*
*Raymond E. Cline, Jr.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2023-1922

**Short Case Caption:**  Bearbox LLC v. Lancium LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,945  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date:  10/04/2023

Signature:  /s/ Mark C. Nelson

Name:  Mark C. Nelson

Save for Filing